Case number 17-1043. Eric Friedman, Petitioner v. Federal Aviation Administration. Mr. Chen for the Petitioner, Ms. Gardner for the Respondent. Judge Kittle, don't we need to thank Judge Paz, Mr. Zucker? Oh, Mr. Zucker, my apologies. My apologies, you were appointed by the court to represent appellant and we appreciate your assistance. Thank you. Thank you, Judge Henderson. Glad you're here. Good morning, and may it please the court. When considering an ITDM pilot for first-class medical certification, the essential test in the FAA's view is whether that individual is at increased risk for incapacitation due to hypoglycemia. Five hypoglycemia and two aviation medical experts studying that exact question at the FAA's request agree that Friedman is the quintessential candidate who poses no such risk. The FAA relied on that expert judgment when it decided to certify ITDM pilots in all classes, but it has since unjustifiably turned its back on that judgment in denying Friedman's application for lack of CGM data. Not only does a costly and invasive CGM demand make no sense in light of Friedman's impeccable glycemic track record… Can you say that 90 days of CGM could not possibly shed light on the ultimate decision before the FAA? Yes, Your Honor. In this circumstance, we think that is true. And to be clear, we're not asking for a broad protocol. We're asking for the FAA to look at the record in this case… Wait, wait. You need to answer Judge Friedman's, Judge Williams' question. Sure. That's not what he asked you. Well, I think the answer is that based on the evidence in the record, the CGM would provide no greater certainty. So we do think that he individualized… There clearly is evidence in the record showing that for some purposes, CGM is useful. Not necessarily the purposes advanced by the FAA, but nonetheless some purposes in shedding light on variability, variability both in frequency and degree of hypoglycemic attacks. And piloting a commercial plane is obviously a heavy responsibility. And could there not be data shown by the 90 days that would cast Mr. Friedman's otherwise exemplary record in a slightly different light? Well, we don't think so, Your Honor, because here what we have is the ADA saying, and I think your comment touched on this, that it's not necessarily for this purpose. And the experts, the leading experts in the field have assembled to study this question. They have said very clearly that CGM data is neither necessary nor appropriate. And I think that in this particular circumstance… Well, slow down, slow down. I don't think they've established or that there's any clear consensus that there's no circumstances under which it's necessary or appropriate. There's the Battolini study in the record beginning at page 697 in which it seems clear that people following CGM data were able to hold their hypoglycemia up, I guess is the right adverb for it, to prevent extremities of hypoglycemia. They weren't without it. Now, whether I grant you the connection between that and grant or denial of a certificate is not as clear, but it does suggest that, for example, CGM, a requirement of CGM while he's flying could be useful. I should say the FAA doesn't mention that. Well, Your Honor, we think that there's a considerable difference here between the question about whether or not CGM might be useful when he's flying and whether or not he has met the standard here. And, again, the standard here is whether or not he is at increased risk of hypoglycemia – sorry, increased risk of incapacitation due to hypoglycemia. Increased risk is a somewhat obscure term, right? Increased vis-a-vis what baseline? Well, Your Honor, right now our understanding from the FAA – and they haven't been exactly clear. They've used different terms. They've used general population. They've used first-class pilots. But we think that under any conception he would meet it. And this is the reason why we think that statement is logical. The FAA says that statement is simply untrue or that it's supported by unsupported conjecture. But what I would say is that what you have here is you have a baseline of first-class pilots, and the FAA doesn't know anything about those pilots, right? It can't catch the pilot who, you know, goes out and exercises strenuously and then doesn't eat and then gets in the cockpit. That's actually happened to a non-ITDM pilot before and caused an incapacitation event. On the other side, we know so much about ITDM pilots that are certified because they go through rigorous testing. And in particular here, Friedman has gone through rigorous testing, and I think he's been uniquely vetted here. And in this particular circumstance, we think that based on the individualized assessment, when you have the leading experts coming to this question and looking at his data and seeing over 11 months that he has zero hypoglycemic records and not a single red flag identified in the FAA's January 2017 letter, that there should be some justification before a costly and invasive CGM demand is made in this particular circumstance. Can I – a slight diversion, I'm afraid, but it is pertinent. Both you and the amicus have said that there are seven individuals who have had CGM whose applications for certification remain in limbo. Correct. And what – is there – I know it's not in the record because there's no citation in the record. Is there something that by going on the FAA website one could verify or not, that suggestion? My understanding, Your Honor, is that those applications are private because they contain medical information. Right. And so I don't believe there's a publicly available database. But the ADA – my understanding is that the ADA has been contacted by these pilots. It's actually up to almost a dozen pilots now who have submitted CGM data. My understanding is that the oldest runs back to April 2015. That's when the application was filed, that there's been no action on those. But, no, we don't think that is publicly verifiable. And they bug out, right. But our understanding is that those people have reached out to the ADA. Another question which sort of haunts this case is this very staunch opposition to Mr. Friedman's having 90 days of CGM. And there are references to cost. There are references to inaccuracy. But that simply is not a driving force. Is the cost so high? I mean – Well, yes, and we think that some of the studies discuss this. I can find a JAA site for you if you'd like. But my understanding is that initially this costs thousands of dollars when it's not medically indicated. It's not covered by insurance. So out of pocket, you would first have to buy the technology and the sensors. And the sensors don't last for very long either is my understanding. They last for maybe a week, maybe a little more. And those need to be replaced constantly. And thus they need to be bought constantly. And that can be quite expensive. So my understanding – But you did say that seven pilots have done that, right? What's that, Your Honor? Didn't you just – you did say that seven people have done that. Yes, Your Honor. There are people with CGM data out there. And CGM data can be used by a pilot who chooses to control their diabetes that way. And so just the fact that others do doesn't mean that Friedman would not incur this cost. I'm going to get at your – are you done with your question? In a minute. Yeah. Let me try to get at the questions that Judge Williams was asking a little differently. Sure. So you say in your brief there's nothing this time around that wasn't in the previous record that this court found inadequate, right? So one of the things – what the agency says is that – and I'm reading from their letter to your client – that notwithstanding these improvements, quote, hypoglycemia remains common and frequently goes unrecognized by finger stick tests, right? Now, that wasn't in the previous record. And my question is, is that – do you disagree with that? Well, as a general principle, no, Your Honor. But what I would say to that is that when they talk about that concept in the brief, they cite a study at JA 692. And that study – and they attach a footnote to it. And this is the one that said 62.5% of people, right? And so that study, if you read it, those are people – and these are the words from the study – who had inadequate metabolic control. What? Those are people who had inadequate metabolic control, who had difficulty controlling their diabetes. And so just to make it concrete here for the finger stick versus the CGM for the hypoglycemia question, what you would see is – and this is the American Diabetes Association's point at its brief on page 20 – that finger stick data will expose incompatible glycemic management. That shows you that somebody is not fit to fly. What you would see if you had severe hypoglycemia or if you had recurrent hypoglycemia, you would see that in the record. Your blood glucose would fall, and you would have a reading. But that's not what – And this is particularly – That isn't what the studies show. So look – take out the government brief, if you would. Do you have it there in front of you? Okay. I'm on page 26 of their brief, okay, midway through the first full paragraph. They have three sentences I want to ask you about. Correct. Okay. Glucose fluctuations are often missed by traditional finger stick tests, and they cite a study at 686, right? Which is what it says. It says self-monitoring of blood glucose monitoring – this is with finger sticks – are often not sufficient to detect and reflect various – right? Yes, Your Honor. Okay. So do you disagree with that study? I mean, you didn't in your brief. You didn't challenge that study. No, Your Honor. Okay. All right. And then it goes on, and episodes of both hyper and hypo can be missed and not factored into treatment decisions, and it cites something at Joint Appendix 645. Correct. Which does say that. Exactly that, right? Yes. And then it says CDM is a useful tool for detecting previously unrecognized hypoglycemic episodes, and it cites a study that supports that. Yes, and, Your Honor, that last study is the one that I was talking about. So tell me what am I missing here? What they're saying is that the traditional – is that individuals with this type of diabetes who use the finger stick method, that what the continuous monitoring shows is that people who use that still have undetected hypoglycemic episodes, and that that's why they need the test. That's why they need the 90-day data. Well, Your Honor – That's their position, right? Well, yeah, that is their position. So what's wrong with them? Well, our position, as that very study cited in that very paragraph in the brief explains, those are people who already don't recognize their hypoglycemia. So let's say you have hypoglycemia unawareness, right, which is one of the things they're talking about, and those were the types of people that were in those studies. You're talking about the study that said 62%, right? Correct. But what about these other studies that I've just mentioned to you? They aren't limited by that characteristic. Well, Your Honor, it doesn't say either way in those studies, but what I would say is that those studies aren't exclusive to the fact that – and they don't exclude the fact that finger stick can show incompatible hypoglycemia levels when you have somebody who is hypoglycemia aware. And we think here, again, we should go back to the data that they actually have. If he actually had incompatible readings, you have 11 months of data that the experts have looked at, hypoglycemia experts that treat patients every day to figure out whether or not they have unrecognized hypoglycemia and whether or not they should change their treatments and how to best manage their diabetes to avoid these types of harms. Those people have looked at it and said, look, he has zero, zero in those 11 months readings. And if those experts are saying that if we have –  That's correct, Your Honor. Right, and the point the agency makes is that even people who use the finger stick method can be unaware of a hypoglycemic episode. That's their point, isn't it? Well, yes, Your Honor, but we would also, again, we would expect – if that were true in Mr. Friedman's case, we would see some evidence of that by his finger stick. And there is none here. I see, Your Honor. This is really hard. In Friedman 1, Friedman 1 was easy because the agency gave absolutely no reason for what it asked for. It just included CGM in a list. This time around, they've given a reason and they have data that supports it. And it's – what's the basis this court has for second-guessing that judgment under the circumstances of this record? I mean, we're not doctors. All we can do is insist that the agency provide a reason and evidence in support of that reason, right? That's correct, Your Honor. If you were writing an opinion sending this back again, what would it say? Your Honor, what it would say is that on this record, and I think that is the key here, whatever the justification that the FAA has provided in its January 2017 letter and on the record, and I guess all the studies that it has brought to bear here, whatever that tells you about what CGM might do in a hypothetical situation, in this particular situation where you have somebody who has been uniquely vetted by a panel of experts, it's not just his treating physician coming and saying, well, you know, here's the information, here's my study. This opinion has then been sent to seven experts who all agree in that circumstance. They haven't pointed to a single reason why CGM would do anything further to, you know. So you're not asking for a remand for further explanation. You want this court to order the FAA to grant the commercial license in this case. That's correct, Your Honor. I take it though consistent with your position would be remand saying you said you, FAA, say that you make case-by-case determinations, but here you have to refuse to make the case-by-case determination. Instead, you have referred to averages, generalities, and Mr. Friedman falls outside those averages and generalities. That's correct, Your Honor. Let me pose this question for you. Suppose we read the agency as saying, yeah, we didn't take Mr. Friedman's specific data into account, but we're working in an area where there is high variability, both as to frequency and degree, and it seems prudent in that context to, and particularly as CGM for 90 days is not terribly burdensome, to have that additional screen. They didn't say that. Suppose we charitably read their letter as saying that. Would that be reversible? Well, yes, Your Honor, because I don't think it's undisputed here that CGM is incredibly burdensome. It would be costly and it would be invasive. You say it's in the record, but the briefs don't talk about the cost. Well, that's correct, Your Honor. This was a subject that was covered in Friedman 1, but I'm happy to find a JA site for the comment. Okay, that would be good, yeah. But not now, not now. I just want to be really clear about this. You're not asking for a remand for further explanation of the CTM requirement.  That you want this court to order the FAA to grant petitioner a commercial license? That's correct, Your Honor. On this record? Correct. Okay, thank you. But you're not rejecting the alternative of a remand for a reasoned decision? Well, Your Honor. That is to say, if the decision before us is unreasoned, that is a characteristic remnant for us to apply. Well, yes, Your Honor, but we do think that given the way that this litigation has developed and the fact that we've already had Friedman 1, and Friedman 1 had a very clear mandate to justify CGM, and we think we made this argument very clearly in the last round during Friedman 1. We said, based on this record, and we think that in order to comply with that mandate, at the very least, before sort of talking about CGM in the abstract, the FAA should have dealt with Friedman's record on its own terms. All right. Thank you. Oh, wait. Hold on a second. Sure. Go ahead. Can you hear me? Yes. Yes. Okay. First, Mr. Chen, you mentioned the development of this case. It's odd to me when I read Friedman 1 that your client asked for the first-class medical certificate, and when the FAA said, all right, we'll consider it, your client then said, oh, but you can't consider it. And then that caused the FAA to say, well, we will reconsider the fact that we don't consider it. That's something that troubles me. But my question to you is, am I correct that there is a gap in your client's 500-plus fingers that only 2% of those were done at night, and that episodes of hyperglycemia occur at night, obviously, and he would be flying at night? Now, is that a gap that I'm incorrect about? Well, Your Honor, Mr. Friedman is sleeping at night, so he's not checking his glucose. I understand that. But he would not be, you know, sleeping while he's flying at night. That's, I guess, the answer I would say. And beyond that, the FAA really has not sort of focused in on this nighttime problem as a concern, and I think it's for the basic reason that he will not be, even though he may be flying at night, he won't be sleeping at night, and it's the sleeping that may cause any gaps if there are some. Is that in the record? In other words, am I misunderstanding you? The hypoglycemia is more apt to occur when he's sleeping? Well, Your Honor, what the studies show is that hypoglycemia is something that occurs at night because people are not checking. And they're also not eating, which would repel the hypoglycemia, right? All right. Thank you. If there are no further questions. Okay. Thank you. We'll hear from the government. May it please the Court. Casey Gardner on behalf of the FAA. Mr. Friedman has asked the federal air surgeon to grant him a special issuance first-class medical certificate because he does not meet the medical standards in FAA's Part 67 regulations. So this case is a challenge to the federal air surgeon's discretionary authority to issue medical certificates to individuals who are otherwise unqualified to fly on the face of our Part 67 regulations. And here, because Mr. Friedman has refused to provide the information necessary for the federal air surgeon to make that determination, to the satisfaction of the federal air surgeon, that Mr. Friedman can fly a commercial airliner without endangering public safety, the federal air surgeon did not abuse his discretion by denying Mr. Friedman's request. What are the possible CGM readings, and where would they take the agency? Right? I mean, you have apparently seven or more people who've done CGM in limbo. So is there any reason for us to believe that any reading, any CGM reading, no matter how exculpatory as it were, would lead to the FAA issuing a certificate? It absolutely would, Your Honor. That's the precise reason that we are requesting the CGM. Again, what we have— What is the reason you're requesting it? Because there is some level— Could you go back to—what about these seven? Is that a—let's just—are there seven others, and what are the circumstances? I don't know the exact circumstances of any other pending cases. I know that there are some, and that we are actively reviewing the CGM data of other candidates. I don't know the precise procedural posture of those other individuals. Sorry. Go ahead, Steve. I'm sorry. Your question was, well, what would you— Is there any clue anywhere in this record as to what sort of reading, CGM readings, would lead to issuances of a certificate? Right. So as we stated in our letter of response, or our denial letter, I should say, to Mr. Friedman, what we're going to be looking for with the CGM is evidence of glycemic control and stability. So Mr. Friedman's assertion is that he is so well managed with his condition that he has no risk of incapacitation of having a hypoglycemic event. All we have from Mr. Friedman are these— Now, hypoglycemia is a matter of degree. So have you conceived of what degree of hypoglycemia would be—would rule him out? No, there's no strict numerical thresholds here. There are no standards here. That's correct, because what we're trying to do here is get a comprehensive picture of Mr. Friedman's glycemic variability. What we have are an average of 4.1 finger stick tests in a given day, right? And there's 24 hours in a day, so we have a lot of missing data. We have a lot of holes, and we can't rely on conjecture here to fill in those gaps. There are a lot of studies in the record. Is there any study suggesting that 90 days of CGM would enable a better prediction as to the risk of hypoglycemic attacks down the road for years and years? In other words, it seems to me there are studies in the record, particularly the Battolini study, that suggest that it might make sense for the FAA to say, we'll give you your certificate, but only on the condition that you have continuous CGM while you're piloting. But you don't say that at all. There's some anterior decision that you'll make, which won't be followed up, at least there's no indication it'll be followed up by a condition of continuous CGM. And correct me if I'm wrong, you have not pointed to a single study suggesting that 90 days of CGM facilitate a better prediction about years in the future, even months into the future. Well, I have two responses to that. The first is we did state in our letter to Mr. Friedman that we intend to evaluate the potential use of CGM as a risk mitigation during operations and commercial piloting. So we are considering using CGM as a safeguard measure while the airman is in the cockpit. However, the defining feature of a special issue and certificate, which is what we're talking about here, is that they're, first, discretionary, but second, they have conditions. Usually we ask agencies to exercise, not to abuse their discretion. Absolutely. And to that point, the federal air surgeon here doesn't have unfettered discretion. The standard is in the regulation. And I should note that the standard isn't risk of incapacitation. The standard is very clearly stated in the Special Issues Regulation. It's 14 CFR 67401A, and it states that at the federal air surgeon's discretion, he may grant a certificate to an individual if, and that's the if, that individual can show to the federal air surgeon that he can pilot an aircraft without endangering public safety. So in order for the federal air surgeon to issue Mr. Friedman a certificate here, Mr. Friedman must show to the federal air surgeon that he can pilot a commercial airliner. Let's go back a second. Let's assume the burden is on Mr. Friedman to meet this test. The agency requires a particular screening device, but it does not identify in the record, so far as I can see, any study suggesting the particular device is useful for making this predictive judgment. That's correct because it's only the federal air surgeon that is making this particular judgment. We're talking not about whether CGM is necessary for clinical treatment. I understand that, but you are insisting on a particular type of data, but you appeared to acknowledge to me that nothing in the record supports the proposition that these data would facilitate a prediction as to the risk of a hypoglycemic attack in the future. If that's true, it seems utterly pointless to have this monitoring. Well, the CGM's purpose is that it gives continuous monitoring, right? I understand that, and therefore I can see if you were saying, give you your certificate, Mr. Friedman, but only if you accept the condition that CGM must go on continuously while you're in the air. It's hard for me on this record to see any problem with that. You don't say that at all. You just say we won't look at you because you haven't had this monitoring, and correct me if I'm wrong, you acknowledge there's nothing in the record supporting the idea that it has predictive value for this future freedom from or exposure to hypoglycemic attack. It is useful for detecting unrecognized hypoglycemia. Right, right, yes, yes. But you do not say that it is useful for predicting the future risk of or telling the degree or frequency of future hypoglycemic attack. Let me jump in here because I think the second page of the letter does do that implicitly, and that is when Dr. Berry says the CGM data that we have requested will review for evidence of glycemic control and stability. Now, if that turns out to show glycemic control and stability, I think the implication is, and it's premature to say it, I guess he could have said it, and if it turns out that that shows glycemic control and stability, then we will require you to have CGM from now on, or at least while you're piloting a commercial airline. Is that a correct reading of the letter? Yes, that is correct. We state explicitly that we intend to use CGM as a risk mitigation during operations requiring. Yeah, I understand that. But the other question is the proposition that shows the absence of a risk of hypoglycemic attacks, you will issue the certificate with this condition. That is our intention. You say it's your intention. People often speak of intention very carefully to mean they're not actually committed to that proposition at all. Should Mr. Friedman's CGM data corroborate his assertion that he doesn't show an extreme risk of hypoglycemia? There's no strict thresholds here. There's no number that's going to be specifically disqualifying, and it's important to note also here that we're not using the CGM alone and in isolation. We're using it as a supplement to all of the information that we already have. I understand. I'm a great fan of belt and suspenders. But the question is whether the suspenders are contributing. And if there is a meaningful affirmation by the FAA that below some, as yet unspecified obviously, but below some reasonable level, if the risk is below some reasonable, not the hypoglycemic count, if the risk is below some level, FAA will issue the certificate. It will. You're saying it will. Yes, and that is why we are requesting Nadana to evaluate whether he can fly a commercial aircraft. You say that, and I take your word for it. Maybe the court will take your word for it. It leaves something of a mystery about the elusive seven. Sure, but the question that's important to realize here is that the question is could the federal air surgeon have certified Mr. Friedman based on the information that he had available to him? Did he make a rational decision based on what he was presented? And all he was presented with was finger sticks, which we have said repeatedly to Mr. Friedman and to the ADA, we do not believe show an adequate risk assessment. We don't believe that you can adequately determine. The difficulty with that is that one of the difficulties is that you never have said what would be an adequate risk assessment. Right? Right. So we're new in this game. We've never certified an individual with insulin-treated diabetes for a first-class certificate. We were not even considering these individuals in 2015. Now we are trying to evaluate these individuals on a case-by-case, individualized basement. So we are trying to work with Mr. Friedman to gather the information that we need to make a competent risk assessment. It's a two-way street. We have to gather enough information from Mr. Friedman to corroborate his assertion that he does impose a risk to aviation safety. Would I be accurately describing the FAA's position as follows, if I said, the data petitioners submitted about his individual situation is not adequate because it's all based on finger stick assessment, and CGM data in the record shows that even people with that type of diabetes who use finger sticks still have undetected and variable hypoglycemic levels. Right? That's one. Yes. And number two, that if he's able to show through CGM data, 90 days presumably of no, that it's totally under control during those 90 days, that there aren't events, right, hypoglycemic events, that under those circumstances the agency might consider granting a license. Is that true? That is correct. Okay. Let me ask you this. Can we trim that down a little? Yeah. No events. Now in the record, there's this 70 level, and then at least one doctor says that in fact 66 is perfectly fine. So will one drop below, one moment below 70 be fatal? No. As I said before, there's nothing that's specifically exclusive here. We're not looking at the data for the purpose of trying to keep Mr. Friedman from getting a certificate. We're using it to corroborate his statement. What he's given us at this point is insufficient, so we're going to review the data, again, not in isolation, so there's not one data point that's going to be exclusive. If there's an aberrant data point, we have experts that are competent enough to see that, and we're also going to be using it in combination with the finger sticks that he's already provided because he can continue to use his finger stick for treatment as he wants to. Again, we want to be clear that we're not telling Mr. Friedman how to treat his own medical condition. They can be used simultaneously. We're going to be looking at the data to ensure that there aren't any unrecognized instances because, again, there's a safety risk here. Hypoglycemia can cause issues with cognition, with motor skills, with memory, with executive functions, things you need to fly a plane. And if we can't be sure on the face of the evidence that we have before us that Mr. Friedman isn't having unrecognized incidences, then we cannot certify him in the interest of public safety. We would not be doing our statutory duty here. Go ahead. The amicus brief and the petitioner's reply brief both allude to these seven who have made no progress, no detectable progress after submission of the CGN data. Did those passages in those briefs catch your eye and raise any curiosity in you about these seven? Yes. I mean, what I can say is we're working on it. I mean, here what we're trying to do is make sure that the people we certify aren't posing a safety risk. It seems to be asserted in the briefs that submission of the CGN data has been followed by silence, and I guess that's not completely inconsistent with your working on it, as you say. Some of them date from 2015. It is at least puzzling that work has produced no result. I do apologize. I don't have any personal knowledge of the status of those pending cases. I'm familiar with the facts here, however, and what I can say is that we intend to review Mr. Friedman's CGN data to verify his statement that he's extremely well-managed, sufficient that he doesn't pose a risk when he's in the cockpit. I just have one question. When I was going through your discussion, I mean, in your brief with Mr. Chen about the value of CGN, we talked about this study you mentioned at footnote 7. Do you know what I'm talking about? Do you have your brief there? I do. Why don't you grab it? Our page order will be out in an hour. Well, footnote 7, it's at page 26, midway through the first full paragraph. Well, that's where the text is. I'm looking at footnote 7. Do you have it there? Yes, I do. Okay, so it cites this study which found that CGN detected unrecognized hypoglycemia in 62% of the type 1 diabetes. There's a study at 692, right? So when I asked Mr. Chen about that, he said, well, I think what he said was that that study isn't really relevant because the subjects of that study were people who had uncontrollable hypoglycemic events. It doesn't apply to someone like Petitioner here. What did you think about what he said about the irrelevance of that study? I mean, the study shows that CGN has a utility. That was the purpose of the inclusion. But he said it was with a different class of diabetics. Right. Is that true? Your Honor, I apologize. I don't recall the exact facts of that study. However, the purpose of including this study was not to draw an exact parallel to Mr. Friedman. The first time this case came before this Court, you said that we didn't have anything in the record to support our contention. We looked at the issue again, and we pulled a body of literature that supports our positions here, that CGM is useful. It is helpful to ascertain whether or not an individual is having unrecognized hypoglycemic events. Admittedly, the ADA may disagree, but it's the FAA's aero-medical judgment here that is entitled to deference. It's not for the ADA or Mr. Friedman to tell the federal air surgeon what information he needs to do his job correctly. These are matters of aero-medical safety. They're uniquely within the institutional competence of the FAA. You do know that under State Farm, agencies are expected to link their conclusion to the data they rely on. And I've always understood that to mean pretty specifically. And your brief comes close to that. The letter doesn't come remotely towards it, right? It has a big general conclusion, says there are a lot of studies, and go look at them. State Farm also says that the agency's decision will be upheld as long as the agency's path can be reasonably discerned, and it can be from this letter. Your client could have made the path much easier to discern, in this case, by simply putting into its letter the three sentences you have in your brief with the citations. That's Judge Williams' point. And I don't disagree with that point. However, the letter does identify the safety issue present. We said why we need what we're concerned about. It explains why the sphincter tests are insufficient, and it explains why we need the CGM, and we explain what we're going to do with it. Okay, I got it. Okay. Judge Henderson, did you have any other questions? I don't. Okay. You don't? Yes? No. Okay. Thank you. Did Mr. Chen have any time left? You can take two minutes. Thank you, Your Honor. I won't take this out of your two minutes. Okay. Can you just tell me once again why this study and the footnote, why we shouldn't consider that as supportive of what the agency has done? Well, Your Honor, I think you can take the FAA's concession to start, that this is not an exact parallel, and they actually don't think this study is wise. Well, why don't you just tell me why you don't think this study is wise? What was the reason again? We think that when you have somebody, so first of all, the study subjects people, right, study subjects, I'm sorry, that have inadequate metabolic control. I see. These are people that already we know will have unrecognized hypoglycemia. Okay. And so applying the study in the abstract, we think, makes no sense. And again, the FAA has just said it's not exact parallel, and we think there needs to be a tie here. Go ahead with your points. And just to finish that point, Mr. Freeman is not, we think, your average patient again. One quick housekeeping matter, the cost site would be at JA-722, and if I can make two brief points as well. The first being that the FAA's counsel has also conceded that there really is no link here to predictive value, and to the extent that they cite studies in their brief, we think they completely overread them. It's one thing to say that if you have a series of pictures showing which way a soccer ball might be flying, you know where that soccer ball is going to land. It is a whole other thing to say, what is his risk when he gets into the cockpit? There is no study that makes that leap. The last very brief point I would make in my last 30 seconds is that as to the remedy, I'd like to be clear that, you know, if this Court is not comfortable remanding for the FAA to grant the certificate outright, we do think that, you know, a remand for further explanation, we think taking CGM off the table would be sensible if it hasn't been justified here. Wouldn't the consequence of that be to order the medical certificate granted? Well, Your Honor, I mean, I read your brief carefully. You asked for this Court to order the FAA to grant the medical certificate, and if we sent it back and said, well, you know, you need to give us more information about CGM and why it would be useful, and if they can't produce it, isn't the immediate consequence of that that your client gets his license? Well, Your Honor, we would think that on this record, yes. But at the same time, if the FAA were to have some other explanation, then I suppose it could offer it at that time. Thank you. I'd just like to make one remark before the lawyers go, and that is in preparing an appendix, it would be awfully helpful if you allowed the readers to see the page numbers. A large number of the page numbers are blacked out almost entirely. It makes it a tremendously difficult exercise to find what's being cited. Thank you, Your Honor. It doesn't seem much to ask. May I add, assuming I'm not sure I can speak for Judge Henderson, but I believe the panel is unanimous on that point. Thank you, Your Honor, and I apologize. Case is submitted. Thank you. Stand, please.
judges: Henderson, Tatel, Williams